Thank you, Mr. Ostergren. Good morning. May it please the Court, my name is Alan Ostergren from Des Moines, Iowa, here on behalf of Appellant Russell Hotchkiss. In First Amendment cases, the decision of whether to issue a preliminary injunction against the restriction of speech, the case normally rises or falls on whether the plaintiff can show a fair chance of succeeding on the merits of the claim. The merits issue is the issue for a preliminary injunction. Well, that's not really true historically. If the Court finds that the merits have been established by the plaintiff... Justice Fleck said you cannot have a preliminary injunction if you don't have irreparable injury. That's correct, Your Honor. That's the number one standard. It's been modified over time by people that get caught up on success on the merits, but it is equally significant. In the Elrod case, Elrod v. Burns, the United States Supreme Court said that the restriction... That's not been applied literally. You can rest on that if that's your injury showing, it's fine. And I would point the Court to its recent decision in Parents Defending Education v. the Linmar Community School District where it found that the other preliminary injunction factors were satisfied once the Court determined that the merits had been established on the underlying First Amendment violation. What is the irreparable harm here? The irreparable harm is that my client can't go to school board meetings and speak his mind. That's primarily the most significant harm because he's open-enrolled his child to a different school district. So the harms related to not being able to go to school events, to be on school property and be involved with his child's education, those are not an irreparable harm because he's switched school districts. But the inability to go to public comment time at school board meetings is the irreparable harm. Were there other ways he could communicate? The no trespass order said he couldn't land on the property, but he could communicate in other ways, correct? The order, the letter, permitted him to send emails or letters to the school board members. And does the record show any efforts on your client's part to do that? Not after the order was issued, no. What he wanted to do was participate in public comment time, which the district continues to permit to have during its monthly meetings. And that's where he wants to go and speak his mind to his elected officials. And so how long did he wait before filing for this preliminary injunction? Approximately 15 months, Your Honor. So doesn't that factor into whether or not that he considered this to be irreparable harm? If he wanted to get into the school board meeting, file it right away, right? I think I share the feeling of many lawyers that they wish their clients would get to their office sooner rather than later. Clearly, Mr. Hotchkiss said in his declaration that he wanted to continue to speak at the meetings. But the timing is what it is. He was served the notice January 2022, and we filed suit in, I believe, May or June of that year. Excuse me, 2023. Turning to the merits. So you're saying he wants to go to the Cedar Rapids school board meetings and speak his mind, even though his child is enrolled in another district at this point? Yes, Your Honor. Yes, he does. You know, he feels passionately about the district's policies and the harm that it had on his child and other children. He has views on the learning loss caused by the district's policies that he wants to share with them. But there are all kinds of ways to communicate to the public those views. Why is presence at the board meeting so important other than to continue his harassment, if you will, of the board members? Because it is an opportunity to speak directly where he knows that the board has to pay attention to him during the meeting. I'm not aware of any case that said that the government can restrict speech in one medium because other media are available to the speaker. It's up to the speaker to decide how he wants to communicate his message to the government. And, you know, the government can't restrict the sidewalk preacher just because a person can preach on Sundays at church. There's no authority for the proposition that because there's some alternative means of communication that the government is free to violate someone's First Amendment right to participate in a limited public forum. Is that the same analysis that we'd be considering under a preliminary injunction standard in terms of irreparable harm until this case can get to a trial or however it gets resolved? Do we look at it the same way? Well, I think so, Your Honor. I can't do better than what the U.S. Supreme Court said in the Elrod case, which is that it's presumed to be irreparable harm when First Amendment rights are diminished in any way, when a speaker is prevented from communicating. That doesn't factor. We're talking about the data phase factors, which requires all kinds of balancing. And the lack of a more rational reason than you've given for his passion to be at these board meetings, which I think the board would infer is in order to continue his pointed critical comments to the board members, looking them in the eye and making them as uncomfortable as he can. And I think under the limited public forum analysis on the merits, and certainly at the preliminary injunction stage, that's highly relevant. I can't do better than what the court said in the Parents Defending Education v. Limar case just a few months ago, in which once the court found that the merits were established, it said that the other data phase factors followed naturally from that determination on the merits. How do we know this man really wants to go back to these board meetings? Is there any evidence of that? Or is this just a construct in order to create a claim of harm? I mean, has he testified or averred under oath that he wants to go back to board meetings, even though the pandemic is over and the child is moved and so forth? Yes, Your Honor. He has said in his declaration that he wants to speak to the board in the future. He wants to be let back in. Where would I find that in the record? It would be in Mr. Hotchkiss' declaration, which I'll point you to in the page 20. Go ahead. I'm sorry. Page 22 of the appendix is the declaration, which adopts the factual allegations in the complaint. Okay. I'll look at it. Thank you. Go ahead. You wanted to proceed on another topic. Thank you, Your Honor. It's important to me. Well, he says, I adopt the complaint. You're saying the complaint then says that he wants to go? Yes, Your Honor. I was just trying to find that paragraph. Do you think there's a paragraph in the complaint that says some years later now he wants to go back to the board meetings? On page 10, he's been unable to attend since receiving the notice. What paragraph? Paragraph 20, Your Honor. Paragraph 20. Because he did not attend the January 22 board meeting, he's not attended any meetings since January 10, 22. He doesn't say there he wants to go back in 2024. That's what I was wondering about. We also include a state law claim, which the district court has in candor since dismissed, but a open meetings state law claim for his continued inability to come back. I think a fair reading of the complaint is he wants to come back. Okay. Thank you. I'd like to point out that the district court never really fleshed out its true threat analysis, and that's pages 157 through 159 of the appendix where it discusses the true threat issue. The things that the district court cites as evidence of a true threat fall far short of what this court has said is a true threat that allows the government to restrict speech. I would compare the district court's findings in its order, you know, the sarcastic comment about a board member calling her Ms. Psychology during his remarks, the vote, take the vote tonight, excuse me, the statement, take the vote tonight or we're coming, which is clearly a political reference. Why don't you distinguish Davison v. Rose for me? In Davison, which is essentially the only case that the district relied on in its briefing, the person said that, you know, the school was a target-rich environment, told the board members they would be meeting their creator soon, talked about having a firearm. I have no problem calling that a true threat, and that is leagues away from what Mr. Hotchkiss did. How about I will make sure you are incarcerated? How does that speak to political process? You know, Mr. Hotchkiss believed that government officials would treat the board's actions as violations of civil and criminal statutes. Now, I don't think that they are going to go incarcerated. Well, first of all, it's far-fetched, but second, he doesn't say that. He says I will make sure that you are incarcerated. I think the context of that, Your Honor, is that he is going to raise what he believes are civil and criminal violations of the law of the board. Well, civil wouldn't be incarceration, and criminal wouldn't be his to-do, as I understand it. True, but I think the context of that comment is he wants other authorities to deal with this school board, and he may be misguided in the view that somebody is going to be criminally prosecuted on the school board. Obviously, that's not going to happen, but it's not the same as a statement, you're going to meet your creator soon, telling somebody that they're going to be subject to the criminal justice process. What we're coming for you is getting there. I think the context of it, Your Honor, is very clear in the video that he's talking about the upcoming school board election. Wait a minute. I thought this was the perception of the target that matters. Reasonable perception. It has to be objectively reasonable. If I was Ms. Psychology and I heard all of this, yeah, I'd have my kids specially protected in the evenings. Your Honor, all I can point to is that the true threat analysis requires it to be viewed as a legal question for the court, as from an objective hearer standpoint. Somebody's idiosyncratic fears or sensitivity is not relevant to that First Amendment analysis. What about disruption of the meeting? I know your man says he wasn't the ringleader, but the board believed that he was. I understand there may be a dispute about whether he was, but if the board believed that he was leading the disruption, wouldn't that be a permissible basis to exclude someone from future meetings? I don't believe that. It's essentially almost a heckler's veto argument, Your Honor, that because somebody else is inspired to chant, take the vote, that somehow my client can be kicked out permanently. Well, I'm not sure quite what you mean by heckler's veto in that context, but I'm saying if a person at a meeting organizes a disruption of the meeting, would that be a basis to exclude the person from future meetings? If there was evidence that the person was in fact the ringleader of disruption as opposed to the ringleader of opposition of commentary. But on a First Amendment claim, this is a First Amendment claim, correct? Yes, Your Honor. It seems that one element would be to prove motivation of the board. Is that correct, that they are motivated by the plaintiff's speech? Yes, Your Honor. So what I'm getting at is if they believed that he was the ringleader, whether they were correct about that or not, wouldn't that be a non-First Amendment motivation? They would have to have some sort of objective evidence, I think, to back that up, because otherwise this motivation argument becomes the loophole, if you will, to the true threat doctrine. And certainly that's how the district court analyzed it, and that's how the school district. See, you didn't hear, in response to my Davison question, you didn't get what I was referring to, the passage that says, well, it is true that some of the speakers were very animated and several used explicit words. None of the speakers, meaning the other speakers, made comments about individual board members. And I think disruption can be reasonably defined by the board to include pointed remarks at individual members that may ostensibly be on the subject that the meeting is about, but are in fact attacks on individuals. And that is disruptive in and of itself to me. My light's about to turn red in my response to your question. Please. Thank you. I would like to leave you with the fact that there was no interaction between the presiding official, the board president, and my client. There was never an indication of, please confine your remarks to an agenda item, please don't talk about individual board members. It's simply they sat there in silence and then banned him from life, for life, in response to that. If there had been a dialogue, if there had been any kind of. So if they had a public security officer there and told him to remove Mr. Hotchkiss in the middle of these remarks, your case would be weaker? What I'm referring to, Your Honor, is the presiding official, if they truly think it's disruptive to say, to talk about a board member individually, then the board president should say, please don't talk about board members individually in your comments. It should go without saying, if it's personal remarks. When you say banned for life, did the letter actually say that, or are you just saying there was no ending date specified?  Was there any reinstatement type provision in the letter? No, Your Honor. But presumably he could ask and see what happens, but you're just saying there's nothing providing for it? There's nothing provided for in the letter. It is, you're banned. Yeah, okay. Period. Thank you. Thank you, Your Honor. Ms. Colby. May it please the Court. My name is Emily Colby. I represent the Cedar Rapids Community School District. It's school board members and superintendent. If it's all right with the Court, I'll just refer to my clients collectively as the district here today. We're here on an interlocutory appeal from the district court's denial of Mr. Hotchkiss' motion for preliminary injunction. And this court has recognized that injunctive relief is an extraordinary and drastic remedy. And here, the district court found that Mr. Hotchkiss failed to satisfy his version. If it was that extraordinary, we wouldn't have so many preliminary injunction appeals every year. Point taken, Your Honor. But here, the district court found that Mr. Hotchkiss had failed to satisfy his burden to show that any of the four factors required for injunctive relief weighed in his favor. And the court's ruling is reviewed for an abuse of discretion. And that's only when the court has based its conclusion on clearly erroneous factual findings or legal error. And here, Mr. Hotchkiss has not identified anything that would rise to that level and warrant a reversal of the district court's ruling. And I'd like to start first with that issue of irreparable harm. And Judge Loken, as you noted, irreparable harm is required in order to justify entry of an injunction. And in this case, Mr. Hotchkiss waited more than 16 months to file his lawsuit, and then another three weeks to seek a preliminary injunction from the district court. That delay is unreasonable, and there's been no justification that would show why that delay should allow Mr. Hotchkiss to still obtain injunctive relief. Now, how does that argument work if he's been harmed through the whole 16 months but just didn't seek relief? Why does he not still suffer irreparable harm after the 16 months? And the district court recognized that if, on the merits, Mr. Hotchkiss is able to show that there was a violation of his First Amendment rights, that he would be entitled, potentially, to recover damages, and that those damages could similarly compensate him for whatever harm he incurs during the pendency of the litigation. But because there was this unreasonable delay, he's not able to show any irreparable harm has occurred that would justify kind of skipping all the way to the end to obtain relief that he would be entitled to at the end of this lawsuit. You're saying that not only irreparable harm, but I would assume likelihood of success on the merits means success in obtaining a permanent injunction. Otherwise, a preliminary injunction is, well, let's get on. I don't call your first witness your first damage witness. Correct. And here, you know, if, in fact, Mr. Hotchkiss can show at the end that there was a violation of his First Amendment rights, he would be entitled to damages. Those could also compensate him here. And what would also go to that issue of irreparable harm, and this was discussed earlier, is that during the time between January 10, 2022, when the No Trespass letter was issued, and May 17, 2023, when the lawsuit was filed, nearly 40 school board meetings had already happened. And during that time, Mr. Hotchkiss made no attempt to return to meetings. He did not submit any written comments for consideration at school board meetings. And that's despite the fact that the No Trespass letter expressly stated that he could continue to communicate in writing with school board members. He did continue to communicate in writing with school board members, but not about any issues related to school board business. Instead, he continued to send them letters that they perceived as threatening and harassing. What were the topics of those letters, if you say that they weren't on the topic of school board matters? They were communications related to Mr. Hotchkiss' belief that the school board members had violated their bonds, that they owed him damages. I think it was upwards of a trillion dollars in some of those letters. Are those in the preliminary injunction record? I believe that those emails were included in our appendix to the district court, and yes, those emails should be in this appendix as well. Well, why doesn't he have a First Amendment right to send those kinds of communications if they're not threatening harm to the people? I thought there was a pretty clear distinction in the law between threats and so-called harassment. There is a distinction in the law, and certainly, depending on whether or not those communications are viewed as threats, he may be entitled to send those communications, but that doesn't mean that he's entitled to attend board meetings where his communications are causing a disruption in the context of a limited public forum. That's where, here, the district's actions in issuing him a no-trespass were due to the conduct that Mr. Hotchkiss engaged in, the disruption that occurred to board meetings, and the violation of the district's policy that prohibits members of the public or anyone else at school board meetings from engaging in disruptive conduct, including personal targeted attacks on school board members. So I think that's where that distinction is between does he have a First Amendment right to do this anywhere, maybe standing on a street corner, potentially, but not in the context of a school board meeting. What do you mean by a targeted attack? I mean, if a person goes to a school board meeting and says, I've heard the comments of Board Member A, and I think Board Member A's comments are misguided and wrong, and here's why. Is that a targeted attack or whatever you said, a targeted reference to Board Member A? No, I don't believe that would be a targeted attack on a school board member or anyone else. The conduct rules at the district school board meetings, they do prohibit people from engaging in demeaning or otherwise threatening, harassing behavior. Well, I mean, demeaning is different than threatening. If you stand up and you call Board Member A a name and make fun of their name or something, is that unprotected speech? I don't know that it would be entirely unprotected speech, but I think it could certainly violate the rules that a public body has in place that govern the orderly conduct of meetings in which the public body has to get its business done. Well, I think that's an overstatement. I don't think you could come up with a case supporting that. We can create orderly conduct rules that prevent criticism of board members because it makes them uncomfortable? No, I don't think that just making someone uncomfortable would be enough. I think there would need to be a showing that there has been some disruption caused by it. And so if it's an innocuous comment, you know, making fun of someone's name I think was the example, that would need to rise to the level where a reasonable person would be disrupted by that, where it would create some kind of disruption within a limited public forum. I have a little different question on what's in the record. Does the record show public comments in social media or more traditional media or in any way on this subject? In terms of Mr. Hotchkiss's behavior? What Mr. Hotchkiss made to show his continuing desire to speak out on these issues and inferentially attend board meetings. No, I don't believe there's anything in the record that shows Mr. Hotchkiss engaging in other comments on social media or anywhere else in the public. It isn't very hard to get on social media these days. No, it's not. Bullies are doing it all too much. As to, if we can circle back to the letters or e-mails that he did send to the board after the no trespass order, is the content, in your view, the content of those e-mails, is it the kind of thing he could have said in a board meeting? In other words, if you get up in a board meeting and there's a topic that is going to be addressed and you get up and just start speaking about something entirely different, would you then be asked to sit down? In other words, I'm trying to figure out whether the description of what he said in those post no trespass orders really was something he could have said in the board meeting and would have preferred to say there rather than in the e-mails. Well, we don't know if Mr. Hotchkiss actually wanted to come to the board meeting and speak about those topics. Well, he was told he couldn't go, right? So I don't know. Can we blame him for not continuing to ask a question he knows the answer to, which is, can I come? No, you can't. No, and that's correct. And the no trespass did exclude him until further notice. The communications that were in his letters to the board after he received the no trespass, I'm not sure if I can recall which letters contained which comments at this point, but I think it's important to focus on some of the comments that he did make. I mean, he was quoting that it would be better for him to have a millstone hung around his neck and be thrown into the sea than to cause a little one to stumble. He stated that there was no lengths to which he would not go to bring this fight to your front door. He said that judgment will be done in this life or the next. It was those kinds of comments that are peppered. Those were before the meetings, right? Many of those, yes, were before the meetings, during the meetings, and then after the December 13th school board meeting he sent his comments from the school board meeting in writing to the school board members as well. So the fact that those kinds of comments are in there is kind of part and parcel of the conduct that Mr. Hotchkiss engaged in that caused the disruption to the school board members and to the district overall. And it was this analysis where we're looking at a totality of the circumstances, getting to whether or not there's a likelihood of success on the merits, which we don't need to get to if we're finding that there's no irreparable harm here. That can end the analysis. But when we're looking at a likelihood of success on the merits, we're in a limited public forum, and it's these communications that Mr. Hotchkiss sent, his verbal comments to the board, that resulted in a disruption that were the cause for the no trespass. And what was the disruption? There was multiple disruptions. I mean, there was a physical disruption to the school board meeting as a result of the take the vote chant where the board had to recess for 10 minutes. That was after the public comment period. I thought it was disputed whether he was anything more than a participant. Mr. Hotchkiss disputes that correct. The school board members did all testify through their affidavits that they believed that Mr. Hotchkiss is the one who started that chant. The board president and other school board members also testified that, at one point, Mr. Hotchkiss tried to move towards the table. Again, Mr. Hotchkiss disputes that, but that's what the school board members believed. I mean, this sounds like what happens at almost every congressional hearing these days. What's the big deal? I think it is a big deal. It is a big deal to the school board members. These are elected, unpaid officials who are tasked with governing the operations of a school district, and they're entitled to make and enforce reasonable, viewpoint-neutral rules to govern conduct at their meetings. They do protect the school board members' ability to do their business, but they also protect members of the public who do want the opportunity to engage with the board and ask questions. So I do think that that conduct... That prompts another question. I haven't studied the record. I get the sense that there was no attempt by anyone on behalf of the school board before the letter was sent to sit down with Mr. Hotchkiss and say, you know, we've got to talk about when you come to board meetings what's fair game and what isn't and see whether he would give assurances that he will not frighten the board members or whatever it is, whatever prompted the letter. That's true. There's nothing in the record that would suggest that. Isn't that a terrible shortcoming by the board not to do that? I don't think that it necessarily is, and there's two reasons for that. One is that Mr. Hotchkiss did note that he had a meeting with Superintendent Bush at one point. Superintendent Bush tragically passed away, I believe, in the fall of 2022. That was the one with the police officer present, right? And he makes the point that there was no criticism that he had caused disruption. But that wasn't reaching out to say, okay, after the second meeting, you've now, in the opinion of the board members, you've disrupted two meetings. If you're going to come again, we have to talk about the rules of the game. Nobody did that, right? No, not that we know of. Nobody did that. Well, I think you'd know if somebody had. We may know, although we don't. We haven't, unfortunately, been able. We don't have Superintendent Bush's testimony available as to whether there was any. But she's not the only one that could have done that. Correct. And what the board president testified to in his affidavit is at least during the school board meeting on December 13th, that he believed any attempt to engage with Mr. Hotchkiss or address the situation could have just escalated tensions further. Well, that's during the meeting. That's not the point I'm making. After the meeting, before the next meeting. After the meeting. When there's serious discussion that whether he should be banned, whatever, you know. Sit down with him. Yes. That's what public servants ought to do. Well, I would say that in the no trespass letter, Superintendent Bush invites Mr. Hotchkiss to contact her if he does have questions. And I see my time is up. May I finish my answer? Sure. That Superintendent Bush invited Mr. Hotchkiss to contact her with questions. And immediately upon receipt of the no trespass letter, he did that. Mr. Hotchkiss asked Superintendent Bush if the letter meant that he could not continue to pick up and drop off his child at school. And she immediately told him, no, you can continue to do that. So I think there is evidence, at least, that he had. That doesn't address the point of meetings. Not the point of meetings, no. But I think there was an avenue for him to ask questions. It was after that exchange that the board sent out its. Well, this was in response to the letter. Yes, Your Honor. And my time is up. Could I? One question. Maybe I misunderstood the record. But I thought that there was something about a meeting between Mr. Hotchkiss and maybe his child and the superintendent. Did I misunderstand that aspect of the record? No, that's correct. There was a meeting between Superintendent Bush and Mr. Hotchkiss. I don't recall if that was after the November meeting or the December meeting. But we don't have any facts other than Mr. Hotchkiss' testimony about that meeting. I see. Just the fact that it occurred. Correct. And we have no testimony, unfortunately, from Superintendent Bush. Correct. Thank you. Thank you. Thank you, counsel. The case raises interesting issues and it's been thoroughly briefed and argued. We'll take it under advisement.